Otsego County Cooperative Association, Inc. v. Commissioner.
Otsego County Coop. Ass'n v. Commissioner
Docket No. 28479.
United States Tax Court
1952 Tax Ct. Memo LEXIS 125; 11 T.C.M. (CCH) 818; T.C.M. (RIA) 52246; July 31, 1952
*125 Petitioner is a cooperative corporation organized under the laws of Michigan. It paid patronage refunds to its patrons during the taxable years 1946, 1947, and 1948 and excluded the amount of such refunds from its gross income. Respondent denied the exclusions on the ground that petitioner was not legally obligated to make the payments and that therefore such amounts were income to it. Held, petitioner was legally obligated to make such payments and they should be excluded in computing petitioner's net income subject to tax. Eugene L. Hensel, Esq., 8 E. Long St., Columbus, Ohio, for the petitioner. John L. King, Esq., for the respondent. RICE
Memorandum Findings of Fact and Opinion Petitioner requests a redetermination of its deficiencies in income tax and declared value excess profits tax as follows: Taxable Year
Declared Value
Ended
Excess
June 30
Income Tax
Profits Tax
1946
$1,308.38
$313.31
1947
793.29
1948
652.48 The question to be decided is whether petitioner is entitled to exclude from gross income amounts of patronage refunds distributed by petitioner to its patrons in the taxable years. Some of the facts were stipulated. Findings of Fact The stipulated facts are so found and are incorporated herein. The petitioner is a cooperative corporation organized under the laws of the State of Michigan. Its original Articles of Incorporation were filed with the Secretary of State on November 17, 1936, as a cooperative corporation for profit, under Title 21.98 to 21.108 of the Michigan Statutes Annotated, which is a part of the *127 general corporation law of Michigan. By an amendment to its Articles of Incorporation, filed with the Secretary of State on August 12, 1943, petitioner was converted from a cooperative corporation for profit to a nonprofit cooperative corporation. Four principal changes were effected by the adoption of the amendment: (1) the authorized shares of capital stock were reduced from two classes to one class; (2) payment of dividends on capital stock was prohibited; (3) the qualification for ownership of stock was limited to producers of agricultural products who patronized the corporation; and (4) a revolving certificate of indebtedness system was inaugurated. The original By-Laws of the petitioner were adopted September 15, 1936. Articles II, VII, VIII, and XIII were amended on July 28, 1943. Under the terms of its Articles of Incorporation and By-Laws, the petitioner was organized to operate as a farmers' cooperative, and to engage in the marketing of farm products and the purchase and distribution of farm production supplies, on a cooperative basis, for the mutual benefit of its members and other producers of agricultural products. Each stockholder was entitled to only one vote, regardless *128 of the number of shares owned. Voting stock could not be sold, assigned, or conveyed by the holders thereof without the prior approval and consent of the board of directors. During the taxable years involved, only common voting stock was issued and outstanding. The methods used by petitioner in the receipt and disposal of revenues were governed by Article VIII of the By-Laws. Section 4 of that Article provides: "The corporation is authorized to deduct and retain from sales proceeds of agricultural products or supplies or charges for services such amounts as are deemed necessary and adequate for expenses, including provision for depreciation and other valuation reserves, interest on indebtedness, and for all capital purposes including capital reserves and surpluses required or permitted by law, and such other amounts as shall be necessary for furth [forth] capitalization of the corporation." Section 5 of the Article provides for the disposition of amounts retained during the year for capital purposes, as follows: "At the close of each fiscal year amounts retained during the year for capital purposes and amounts deducted from sales proceeds or charges for services in excess *129 of amount required for expenses, including provision for depreciation and other valuation reserves and for interest on indebtedness, shall be distributed upon a patronage basis as revolving fund credits to the patrons delivering the products, purchasing supplies or receiving services from the corporation." Section 6 of the Article, which relates to the allocation to patrons of general reserves, is as follows: "The books and records of the corporation shall be kept in such manner, by years, that the amount retained and carried to general reserves accruing from the patronage of each patron, stockholder and non-stockholder, is allocated to each separately. "Whenever in a given year the operation of the corporation results in a net loss, such loss, to the extent that general reserves are available, shall be charged against the same and they shall be thereby reduced accordingly. The board of directors shall prescribe the bais [basic] on which the reserve contributions of patrons by years shall be reduced on account of any such loss, so that it will be borne on as equitable basis as the board of directors finds practical. "Whenever in the discretion of the board of directors the *130 reserves are found to be in excess of the amount deemed reasonably necessary for the sound financial operations of the corporation, such excess shall be applied to paying off ratably, by years, the oldest unexhausted reserve contribution of patrons. "Upon dissolution or winding up of the corporation in any manner, after the payment of all debts, including revolving certificates of indebtedness, and the retirement at par of all outstanding capital stock, any balance remaining shall be distributed ratably on an equitable basis to those who have patronized and are patronizing the corporation." Section 7 of the Article, which relates to stockholders' equities, is as follows: "This corporation shall be operated without profit. The financial interest of the stockholders shall be that of creditors of the corporation. Stockholders, as such, shall have no interest in any capital reserve or surplus but such interest shall be vested in the patrons in proportion to their contribution to the aggregate capital reserves of the corporation. Stockholders shall not be entitled to dividends on capital stock nor shall payment of dividends on capital stock be permitted." Section 8 of the Article *131 provides that patronage credits of nonmember patrons who are eligible for membership (farmers) shall be applied to the purchase price of one share of capital stock; whereupon, the status of such nonmember patron is converted to that of a member patron. Section 9 of the Article, which provides for a revolving fund method of financing, is as follows: "It is the purpose of this corporation that its entire capital will be supplied eventually by its patrons in proportion to their patronage. "The following program for financing is adopted to provide a plan under which each patron will furnish capital for financing the corporation in the approximate proportion that they patronize the corporation and for which capital the corporation will issue revolving certificates of indebtedness as evidence of the indebtedness owed by it to its patrons for the capital so furnished by them and for retiring such revolving certificates of indebtedness. "Patronage divident [dividend] credits allocated to patrons whose total credits issued in that year do not exceed the sum of $3.00 may be paid in cash when in the judgment of the board of directors it appears advisable to so do. Otherwise, patronage *132 dividend credits allocated to patrons shall not be paid in cash but shall be credited to patrons to be issued as revolving certificates of indebtedness, provided, however, the first Ten ($10.00) dollars of revolving fund credits issued to each non-stockholder patron eligible to become a stockholder shall be applied as payment for a share of capital stock." Section 10 of the Article, which relates to revolving certificates of indebtedness, is as follows: "The board of directors shall have authority to issue revolving certificates of indebtedness of an unlimited amount for use in connection with the revolving plan of financing the corporation. "These certificates shall contain the following priorities, conditions, and requirements, but otherwise shall be in such form as shall be approved by the board of directors: "(1) The claims of holders of revolving certificates of indebtedness of account thereof shall be junior to the claims of all other creditors but shall have priority over all claims of capital stock. "(2) Revolving certificates of indebtedness may be issued in any denomination or principal amount of one ($1.00) dollar or more. "(3) Revolving certificates of indebtedness *133 shall be numbered consecutively and issued in their consecutive numerical order. "(4) Revolving certificates of indebtedness shall be freely transferable, provided however, that any certificate offered for transfer must be returned to the corporation for cancellation, transfer of title and reissue of a new certificate, provided further, that the certificate to be reissued shall bear the same number as the certificate surrendered for transfer. "(5) Revolving certificates of indebtedness shall bear only such rate of interest as the board of directors may stipulate, provided, that such rate of interest shall in no event exceed a rate of five (5%) per cent per annum upon the principal amount of the revolving certificates of indebtedness outstanding, providing further, that interest at the rate of five (5%) per cent per annum shall be paid upon the principal amount of revolving certificates of indebtedness outstanding before any distribution of earnings is made to patrons upon a patronage basis. Interest upon revolving certificates of indebtedness shall not be cumulative if unpaid. Interest paid upon any revolving certificate of indebtedness shall be paid ratably upon all revolving *134 certificates of indebtedness outstanding except those which have been called for payment and have not been surrendered in accordance with the call therefor. "(6) Revolving certificates of indebtedness shall not carry a fixed maturity date but shall contain provision by which the board of directors shall have power to call and retire any amount or all the outstanding revolving certificates of indebtedness as and when in their judgment the corporation shall have cash funds available for that purpose, provided further, outstanding revolving certificates of indebtedness shall be called in their consecutive numerical order of issue, the oldest outstanding revolving certificates of indebtedness having priority in their call for payment, except in the event of the death of the holder of revolving certificates of indebtedness, in which event the board of directors may, in its own discretion, authorize the retirment [retirement] of the revolving certificates of indebtedness held by such deceased holder before the normal order of their retirement on the basis of their numerical order of issue." Petitioner's certificates of indebtedness were assignable and transferable as shown by the following *135 paragraph which was included therein: "This certificate is transferable only on the books of this corporation upon surrender of the certificate properly endorsed and when any indebtedness owed to the corporation by the owner hereof has been fully paid. Upon transfer of ownership of title to the claim represented hereby and surrender of this certificate for transfer and reissue, this certificate shall be cancelled and the certificate issued shall bear the same numerical number as the certificate surrendered for transfer." The bookkeeping procedure observed by petitioner with respect to allocation of patronage refund credits each fiscal year was described by petitioner's accountant as follows: "After a computation of the total amount of patronage dividends is made, the amount is credited to the capital stock credit account or the reserve for patronage dividends - it's the same - and then when the stock is issued and the certificates of indebtedness are issued, the charge is made to that account and credited to either capital stock outstanding or certificates of indebtedness outstanding." The procedure used by petitioner for distributing income at the end of the taxable years *136 was as follows: The profit and loss account was debited with the amount which the board of directors decided was to be placed in the reserve for patronage refunds account and a credit made to this latter account. When the board of directors decided that certificates of indebtedness should be issued, the amount decided upon was debited to the reserve for patronage refunds account and a credit was made to the certificates of indebtedness account. Certificates were then issued to the stockholder patrons. If a patron was not yet a stockholder, his credit in the reserve for patronage refunds was withheld until such time as the par value of a share of capital stock ( $10) had accrued, at which time a share of stock was issued to him. When the board of directors decided that the certificates of indebtedness were to be redeemed, a debit was made to the certificates of indebtedness account for the amount determined and a credit was made to the cash account. On June 30, 1946, the Capital Stock Credits Account was changed to Reserve For Patronage Refunds Accounts. The reserve for patronage refunds was classified by petitioner as a capital and general reserve although carried on its balance *137 sheet as a liability. Such account was a control account for the credit owing all patrons for which certificates of indebtedness had not been issued. An individual account for each patron was kept showing the credit owing to him. The reserve for patronage refunds account was required to be paid off in logical sequence, i.e., the oldest credits shown in petitioner's reserve were required to be paid before current reserve credits could be paid. The board of directors was not permitted to pay cash for the amounts owing to the patrons as shown by the reserve for patronage refunds account. The credits shown in such account could only be paid by issuance of certificates of indebtedness. During and prior to the taxable years in question, petitioner had no net operating losses. It suffered a net operating loss in 1950 and, to offset this loss, a reduction was made in the reserve for patronage refunds and also in the surplus account. Petitioner issued certificates of indebtedness for credits shown in the reserve for patronage refunds account as follows: Date Issued
Amount
8/22/44
$7,434.26
8/28/45
4,669.14
10/31/45
5,234.44
8/12/47
5,174.65
6/30/49
9,924.90
*138 Petitioner redeemed certificates of indebtedness by the payment of cash as follows: Date Retired
Amount
2/12/45
$2,207.96
4/ 2/45
804.34
5/31/45
104.78
12/12/45
3,217.23
5/29/46
112.04
1/15/47
2,920.03
6/ 9/47
443.51
1/17/50
52.71
Petitioner issued capital stock to patrons having credits in the reserve for patronage refunds account as follows: Date Issued
Amount
8/28/45
$ 370
10/30/45
300
8/12/47
50
6/30/49
980
During the taxable years, certificates of indebtedness were issued in the amount of $15,078.23, shares of capital stock in the amount of $720 were issued in payment of patronage credits, and refund credits in the amount of $18.29 were applied to petitioner's liens for debts owing to petitioner by patrons. In the tax returns, and in the other exhibits, there is an apparent slight discrepancy between the amount of patronage credits allocated on the books of petitioner and in the amounts of certificates of indebtedness actually issued during the taxable years. Patronage credits for various years, if not in the aggregate amount, per patron, of $10, were carried forward until subsequent years, when the aggregate *139 or cumulative refunds of a patron equal $10 or more, at which time certificates of indebtedness were issued to the patron, even though it might be subsequent to the year or years in which the credits were allocated. Annually, and prior to the close of the taxable years, the board of directors passed resolutions apportioning the refund rates as between farm products marketed and farm supplies purchased. As provided by the By-Laws, petitioner, from time to time, redeemed revolving certificates of prior years' issue in cash. The record of cash redemptions of certificates is as follows: Year of
Years of Issue
Amount
Redemption
1939, 1940, and 1941
$3,117.08
1945
1942
3,329.27
1945-1946
1943
3,363.54
1947
The aggregate amount of certificates of indebtedness, as well as credits allocated therefor, was carried on petitioner's balance sheet under the heading "Other Liabilities." Petitioner considered such account to be a capital or surplus reserve account and that the certificates of indebtedness were both liability and capital items. Upon dissolution of the corporation, the claims of certificate holders, as such, were junior to claims of general creditors *140 and senior or prior to claims of stockholders. As shown by the operating statements of petitioner, funds were allocated to the reserve for patronage refunds in the following amounts: June 30, 1946
5% Patronage Refund on purchases
$3,049.58
10" cwt Patronage Refunds on patatoes
3,099.00
TOTAL
$6,148.58
June 30, 1947
8% Patronage Refund on purchases
$3,908.79
7" cwt Patronage Refunds on potatoes
2,626.40
TOTAL
$6,535.19
June 30, 1948
6% Patronage Refund on purchases
$3,613.51
4" cwt Patronage Refunds on potatoes
877.16
TOTAL
$4,490.67 It appears that the petitioner failed to claim exclusion of refund credits for the year 1948 in the amount of $82.30, which represented the difference between the actual amount of refund credits on the books and the amount of $4,408.37 shown in its 1948 return. However, since petitioner filed no amended return for the year, it does not now challenge the inclusion of $82.30, in taxable income, and makes no claim with respect thereto. During the taxable years, petitioner, in computing its net taxable income, excluded from gross income the following amounts claimed as patronage refund credits: June 30, 1946
$ 6,148.58
June 30, 1947
6,535.19
June 30, 1948
4,408.37
Total
$17,092.14
*141 The respondent disallowed such amounts as exclusions from gross income. Petitioner's taxable income as reported on its tax returns was as follows: Fiscal Year Ending
June 30
Amount
1945
$ 993.57
1946
1,530.55
1947
3,125.76
1948
1,840.44 None of the above income was earmarked for patrons. Petitioner does not claim tax exemption under section 101 (12) of the Internal Revenue Code. Opinion RICE, Judge: Before we consider the issue presented, it seems pertinent to point out that no question of exemption under section 101 (12) of the Internal Revenue Code is involved, since the parties have stipulated that petitioner has not and does not claim to be exempt thereunder. Nor does petitioner claim any deduction under section 23 (a) of the Code; it rests its entire case upon the proposition that its patronage refunds constitute exclusions from gross income. Whether petitioner is entitled to exclude from its gross income patronage refunds issued in the form of certificates of indebtedness and capital stock during the taxable years in question depends upon whether the right of petitioner's patrons to such refunds *142 arose by reason of an existing legal obligation prior to the actual receipt of such earnings by petitioner. If petitioner was legally required to make such a distribution, such earnings are not income to it and, consequently, are to be excluded in the computation of its net taxable income. Colony Farms Cooperative Dairy, Inc., 17 T.C. 688 (1951); United Cooperatives, Inc., 4 T.C. 93 (1944). The Michigan corporation statute, under which petitioner was incorporated, provides that cooperatives shall make distribution of surplus earnings on a patronage basis but that certain reserves of such earnings could be set up for future operations or future distribution, and that earnings so reserved must be allocated on the books of the cooperative or a means provided for such allocation for the stockholders or members or other persons entitled to such earnings before distribution of earnings is authorized and made. [1]
During the taxable years in question, petitioner's By-Laws (Article VIII) authorized the retention by petitioner from its income such amounts "as are deemed necessary and adequate for expenses, *143 including provision for depreciation and other valuation reserves, interest on indebtedness, and for all capital purposes including capital reserves and surpluses required or permitted by law". Any excess over expenses, including depreciation, reserves, and interest "shall be distributed upon a patronage basis as revolving fund credits to the patrons delivering the products, purchasing supplies or receiving services from the corporation". This Article also provides for allocation of patronage credits to the account of each patron with respect to the retained reserves. It provides that the amount of reserves shall be subject to diminution in case of operating losses; and for retirement of capital reserve credits upon the revolving fund plan, whenever the board of directors determines that accumulated capital reserves are adequate for operating capital. Payment of dividends on capital stock is prohibited and stockholders have no interest, direct or contingent, in the capital reserves. Each patron's capital credits are required to be evidence by revolving fund certificates. We are of the opinion, after a careful study of the Michigan statute and the provisions of petitioner's Articles *144 and By-Laws, that petitioner was under a preexisting legal obligation to pay patronage refunds, and that this case falls within the ambit of Colony Farms Cooperative Dairy, Inc., supra, and United Cooperatives, Inc., supra, and we so hold. See also Dr. P. Phillips Cooperative, 17 T.C. 1002 (1951). Petitioner is entitled to exclude from gross income for the taxable years the aggregate amount of $15,816.52 representing the certificates of indebtedness and capital stock issued in payment of patronage credits and the refund credit of $18.29 which was applied to petitioner's liens for debts. Since the record does not disclose the exact amounts allocable to each taxable year. Decision will be entered under Rule 50. Footnotes
1. Chapter 195, § 21.100, Michigan Statutes Annotated.↩